**UNITED STATES of America**
**v.**
**Kurt WEISHAUPT and Kurt Weishaupt & Co., Defendants.**
**Cr. No. 45513.**

United States District Court
E. D. New York.
April 22, 1959.

Cornelius W. Wickersham, Jr., U. S. Atty. for Eastern District of New York, Brooklyn, N. Y., by Warren Max Deutsch, Glen Cove, N. Y., of counsel, for United States.

Lloyd F. MacMahon and Robert L. Graham, Jr., New York City, for defendants.

BYERS, Chief Judge.

This is a defendants' motion seeking various forms of relief, as follows:

1. An order declaring unreasonable, illegal and void the search and seizure later to be discussed.

2. Directing the return of all books, papers, etc., seized by the agents and representatives of the United States government, etc.

3. Directing that any and all of the said documents be suppressed.

4. Dismissing the indictment on the ground "that there was illegally obtained evidence before the grand jury."

5. Permitting the defendants to inspect the minutes of the grand jury so far "as they relate to the proceedings resulting in the return of the indictment herein" by reason of the said illegal search and seizure.

6. Directing that a hearing be held in connection with the said motion.

Hearings were held on December 8, 1958, December 22, 1958, December 23, 1958 and April 2, 1959.

The delay between the last two mentioned dates was arranged for the convenience of counsel.

As to number 4 above, it should be noted that a motion to dismiss the indictment was denied by Judge Rayfiel under date of November 6, 1958 (D.C., 167 F.Supp. 211).

As to subdivision 5, nothing was developed at this hearing to justify permitting the defendants to inspect the minutes of the grand jury; and as to that, the motion is denied.

Subdivisions 1, 2 and 3 have to do with occurrences at the residence and place of business of the individual defendant (80–20 Lefferts Boulevard, Kew Gardens, in the Borough of Queens) on March 19, 1957. The defendant, Kurt Weishaupt, is a member of a partnership composed of himself and his wife, and for convenience will be referred to as an individual hereinafter.

He had been conducting business as an importer and exporter of postage stamps at the above address from December of 1947.

It was suggested during the hearing that at most the alleged offence, if committed, did not seriously affect the welfare of this nation. So much may be owned, but is not appropriate for consideration on the legal questions presented by this motion. A time may come when that argument will have its place.

On March 18, 1957, two agents of the Department of the Treasury, Foreign Assets Control Division, visited Gimbel's Department Store for the purpose of ascertaining certain facts with regard to the trading in Chinese stamps. Their names were Walter B. Gorsuch and Richard J. Hollas; they were both lawyers and had been connected with the Treasury Department in the capacity stated, for not less than three years prior to the last mentioned date. Gorsuch is now deceased, so that only the testimony of Hollas is presently available as to the matters concerning which the defendant complains.

The result of the interview at Gimbel's, which was conducted with one Jack Minkus (who was in charge of the Stamp Collectors Department at that store), was the disclosure that Chinese stamps had been purchased from the defendant for a number of years, and it was the source of his supply that the agents undertook to investigate. It should be mentioned that Minkus was requested not to apprize the defendant of the said interview.

On the following morning Gorsuch telephoned the defendant, requesting an interview with the latter concerning the importation of Chinese stamps, and after the defendant had requested a postpone-

ment, he agreed to call at the office of the agents after Gorsuch explained that he would like to accompany the defendant to the latter's place of business.

The defendant met Gorsuch and Hollas outside the United States Court House in Foley Square, and the defendant drove the agents to his home and place of business.

There is a conflict in testimony as to whether the agents exhibited evidence of their authority to the defendant at the time that they entered his automobile, Hollas' being in the affirmative and the defendant's in the negative. As to this conflict the testimony of Hollas is accepted, and it is found that the defendant was apprized of the official status of the agents at the inception of said automobile trip.

After the defendant's first telephone conversation with Gorsuch, he telephoned to his lawyer, but was unable to speak to him because of the latter's absence from his office. Thus, before the defendant met the agents at all, he realized that it might be wise to secure legal advice as a preliminary to any interview with the agents.

During the said drive, defendant and Gorsuch had discussed stamp collecting in general, the latter having stated his personal interest in that subject. On arrival at the defendant's residence, the agents were invited by him to enter, and the three men arranged themselves around the dining room table; the defendant asked Gorsuch's reason for the visit, and the latter replied that he should like to know if the defendant imported Communist Chinese stamps, and the answer was negative; that he had sold Chinese packets to Gimbel's Stamp Department which he had purchased from various suppliers, the principal one being Oriento Stamp Company of Hong Kong; another was H. J. DeWitt in Amsterdam, Holland, and the third, the Empire Stamp Company in Toronto, Canada.

Gorsuch then asked the defendant to produce the invoices of dealings with the above, and also the Broadway Stamp Company of London.

According to the defendant, the defendant then said:

"I would like to talk to my lawyer again to find out if he is in because I would like to have him present."

Defendant again telephoned his lawyer and found that he was still out; Gorsuch is stated to have said that he only wished to ask the defendant simple questions which he could answer for himself and did not need a lawyer.

Again, there is a conflict in testimony as to what immediately ensued. The defendant says that up to this point Gorsuch had not served any paper of any kind upon him and that he hesitated to comply with the request above stated.

The said papers were produced and both the defendant and Hollas testified that the defendant was reluctant to comply with the request. At that point, the testimony converges.

Defendant testified that Gorsuch said, "You know, if you do not present the papers willingly we can get a court order any time we want. One of us even can stay here while the other is going to get the court order."

The defendant then placed the papers on the table.

Thus far invoices alone seem to have been involved.

Hollas testified that Gorsuch said,

"Mr. Weishaupt, you need not— as your Constitutional rights, you don't have to make any statements which may tend to incriminate or degrade you insofar as your records are concerned. If you are not going to make them available to us we will serve you with a subpoena.

"Mr. Gorsuch then said Before serving a subpoena we suggest (sic) that he contact his attorney."

As to the warning, the testimony is again in conflict. The defendant says, "I was not advised at any time of my rights as a citizen, nor was my protec-

tion under the Constitution brought to my attention at any time." The defendant said that he was not told at any time that he did not have to answer any question.

This conflict is resolved in favor of Hollas' version, for the reason that both he and Gorsuch were lawyers and there is attributed to them by this court an understanding of the importance of the warning, in view of the nature of their mission.

Moreover, the defendant's attempt to communicate with his lawyer as early as a time prior to his meeting with the agents, showed that he understood from the outset that he had the right to question the legal capacity of the agents to make inquiry of him. Again, the defendant was sufficiently alerted to the legal consequences possibly involved, by stating that he wished to speak to his lawyer before submitting his papers to examination by the agents.

These reflections induce the belief, presently held, that the warning was given, even though the defendant had already expressed himself, as above recited.

In this connection, the testimony of the attorney Walton should be referred to.

He said that he had a telephone conversation with the defendant between 2:00 and 3:00 o'clock in the afternoon of this day, which involved an explanatory statement by the defendant to him, and an interruption of that conversation to enable Walton to speak to Gorsuch. As to that, Walton says:

"I asked him what he was doing at my client's office. He said he was looking through Mr. Weishaupt's records and books in relation to certain transactions * * * in connection with the purchase and distribution of Communist stamps of Red China. I asked him whether he had any authorization to conduct such a search, whether he had a search warrant or an order of the courts or any other authorization. He said no.

"And I said to him that I believed that he had no right to make any such search or to ask any questions in regard to it, and I told him to stop it.

"I then asked him to put Mr. Weishaupt back on the telephone. * * * As I recall it, he said he could very easily get that authorization, or equivalent language.

"He" (meaning the agent) "said he had already gone through certain things, and I believe he said that he was going to seal that material, this material he had gone through, so that if matters had to be held up while he got his authority I wouldn't have any chance to look at these papers either. * * *

"Q. Did you talk with Mr. Weishaupt before you talked with Mr. Gorsuch? A. I did."

With regard to whether his client followed his advice, the testimony continues:

"Q. What did he" (the defendant) "say? Would he follow your advice or not follow your advice? * * * A. He said to me that he heard me, that he understood me, that he would—he didn't say he would follow my instructions, but that he would do what I said, or the equivalent language. I don't remember the language itself."

The remaining testimony of Walton has to do with compliance on the part of the defendant with an order to produce records, bearing date March 22, 1957, later to be referred to.

Since it thus appears that the defendant had the benefit of the advice of his lawyer while the agents were conducting their inquiry, the finding with reference to the giving of a warning is not a material element in this matter, and is stated only for the sake of completeness.

It is a fact that in addition to the invoices, correspondence between the defendant and the Oriento Enterprise and other sources of supply was later produced by the defendant and exhibited to

the agents for their inspection. The defendant stated that he was unwilling to have any of that correspondence removed from his possession, and then it was that all such papers, in considerable volume, were placed in a large envelope which was produced by the agents and sealed; that is to say, two labels were placed over the flap of the envelope, and the defendant was instructed that these papers were to be deemed to be in the custody of the agents and were not to be inspected by the defendant or his attorney, although physical possession thereof was not changed.

I find it difficult to understand upon what theory that procedure could be legally justified, although it should be said that it was not resorted to until there had been served upon the defendant by the agents, a document entitled "Order to make records available for examination" which constitutes Exhibit 1 attached to the opposing affidavit of the agent Hollas, verified December 1, 1958.

The direction of that document is "to make available forthwith for examination by representatives of this Department" records as specified, relating to transactions "engaged in by you on or since Jan. 1, 1951 and relative to any property in which any foreign country or any national thereof has or has had any interest of any nature whatsoever, direct or indirect, on or since said date." Then follow references to the Code of Federal Regulations which require that any person engaged in any transaction falling within the Trading with the Enemy statute shall keep full records, etc.

A further reference is made to the applicable provision of the said regulations to the effect that every person is required to furnish under oath in specified form as may be required by the Secretary of the Treasury, complete information of any transaction or property within the scope of the law; and that the Secretary may require that such reports include specified documents and that the same officer may investigate any such transactions.

Finally, the statute is quoted as to the criminal sanction involved in a violation of the law.

Nothing is stated in the foregoing concerning the right of the Secretary or any of his agents to seal any such records or withhold them from continued inspection by the owner of such documents.

It is probably unnecessary for this court to express an opinion as to the legality of the sealing above recited, which is a practice which seems to have passed muster in the case of Wagman v. Arnold, 2 Cir., 257 F.2d 272, that reviewed the decision of the District Court referred to in 152 F.Supp. 637.

As will be seen, it is the present opinion that this defendant waived his legal rights in connection with all that the agents did on March 19, 1957, which probably renders it inappropriate to reserve an expression of views as to the legality of the sealing.

With reference to the service of what has been loosely called a subpoena, the testimony is in conflict. The defendant said that he was not served with a subpoena at all on that day, and that he so stated to his attorney Walton over the telephone at the interview above referred to in which Gorsuch participated. The defendant says that at the end of the telephone conversation he heard Gorsuch say to Walton, "Well if you want it that way then I will just seal the correspondence and you cannot look at it either."

Hollas' testimony, on the contrary, is that such a so-called forthwith subpoena was served by Gorsuch when the defendant refused to turn over the various papers, thus:

"The Witness: He didn't volunteer, sir, not in the first instance. He refused to let us see the documents.

"So Mr. Gorsuch served him with a forthwith subpoena at that point.

"Q. There isn't any doubt about that, is there? A. No, sir."

This conflict is resolved against the defendant's testimony, and the finding is that the document above described and

loosely called a forthwith subpoena was indeed served upon the defendant; also that the service was made prior to the time that the defendant and the two agents went to lunch together.

It is also found that Hollas' testimony is to be accepted to the effect that the agents at the conclusion of the lunch were about to return to their office, leaving the envelope containing the various papers sealed, as has been above recited; that as they were about to carry out that intention, the defendant said that he was undergoing a change of mind and in spite of his lawyer's advice, he thought he would permit the agents to inspect the contents of the envelope. Then they returned to the defendant's residence and such an inspection was had, and at the conclusion thereof the envelope was again sealed.

It is found that the agents requested leave to take the envelope and contents with them, but defendant refused and insisted on retaining custody and possession.

For completeness, it should be added that a new so-called subpoena was served on the defendant on March 22, 1957 and the documents therein described were delivered by defendant's attorney Walton into the custody of the agents.

The legality of that second subpoena is not the subject of inquiry in connection with this motion; it must be apparent, however, that the earlier activity of the agents is under attack, for the reason that obedience to the second order to make records available, resulted in placing officially in the possession of the government that which probably constitutes important matter in connection with the prosecution of the case.

As stated in the record at the close of the hearing, it is the opinion of this court that when the defendant rendered available to the agents the contents of the envelope that was sealed, he did so in obedience to the requirements of the order to make records available, knowing that he had the right to refuse to obey that order, and to inform the agents that the legality thereof would have to be tested, either by a motion to vacate, or in opposition to a motion to punish him for contempt in not complying.

However, he did not avail himself of any such right although he had been advising with his attorney at the time when it would have been appropriate for him to have taken that stand; thus he must be deemed to have waived his rights and cannot now be heard successfully to attack the conduct of the agents in seeking the information that they believed they were entitled to acquire, and in employing the methods to obtain that information which the evidence shows that they did.

The motion therefore to declare illegal and void the seizure to the extent that it was a seizure, on March 19, 1957, is denied.

Similarly, the motion to direct the return of all documents and that they be suppressed is denied.

The motion to dismiss the indictment for the reasons herein discussed, and permit the defendant to inspect the minutes of the grand jury, is likewise denied.

Settle order.